By the Court—Bosworth, Ch. J.
The plaintiffs sue as indorsees of a note made by the defendant; which note and the indorsement thereon, when produced in evidence at the trial, were as follows, viz.:
*170 “ $1,000. New York, August 14, 1855.
“ Twelve months after date, I promise to pay the International Insurance Company, or order, for value received, one thousand dollars, payable at the Bank of Commerce in New York.
“NELSON CLEMENTS.”
(Indorsed) “For International Insurance Company,
Alanson Marsh, President."
The defendant during the progress of the trial, took exceptions to decisions admitting and rejecting evidence; to portions of the charge to the jury; and to the refusal of the Judge to submit to the jury the question whether the Insurance Company was insolvent, when it transferred the note in question. The appellant’s points take no notice of certain of the exceptions appearing in the case; all such exceptions we regard as abandoned.
Preliminary to the consideration of the exceptions discussed in the appellant’s points, it is proper to remark, that when the testimony was concluded, the defendant’s counsel requested the Court to charge the jury in conformity to five several propositions, which he stated. The plaintiffs’ counsel then stated to the Court, that he rested their claim to recover on the facts; that the plaintiffs are Iona fide holders of the note for value; and that the Insurance Company is, upon the evidence given, bound as against such holders of the note, by the indorsement of it as it was in fact indorsed.
Thereupon the counsel of the parties agreed upon certain facts, viz.:
11 First. That the note in question was a subscription note, and as such was made and delivered to the International Insurance Company.
Second. That in the month of January, 1856, Alanson Marsh, the then President of the said Insurance Company, in his official character, as such President, placed his indorsement upon such note with a view to negotiating the same for such Company. That after such indorsement the said note was again returned to and remained with said Company, as the holder thereof, until passed to McCready, Mott & Co., as hereinafter stated.
Third. That on the 2d day of February, 1856, the said Marsh ceased to be the President of such Company.
*171 Fourth. That Moses Starbuck became the President of such Company in the place of said Marsh. That said Starbuck, while being such President, and assuming to act as such, negotiated such note, as so indorsed, to McCready, Mott & Company, who loaned said Company the sum of $3,500, taking at the same time from said President a stock note of the Company therefor, together with the note in question, and other notes, to the aggregate of about $5,000, held by such Company, as collateral security for such loan. There was no vote of the Board of Directors authorizing the above loan, or the giving of such collaterals.
Fifth. That the note in question passed, by successive transfers, from said McCready, Mott & Co., to the plaintiffs. That said plaintiffs received such note and discounted the same in the regular course of its business, three days before its maturity.
The Judge thereupon stated the foregoing concessions to the jury, and among other things instructed them—
“ Upon .the question whether the plaintiffs were bona fide holders of the note in question for value paid before maturity without notice. That the circumstances proved do not amount to notice to the plaintiffs of the circumstances under which McCready, Mott & Co., received the note, however invalid the loan made by them was, as in fact it is conceded to have been.
To this instruction the defendant’s counsel excepted.
And upon the question, whether the transfer of the note was made by sufficient authority, the Judge charged the jury,
That, if they should find that for a succession of several months prior to the transfer of this note by the Company, it was the usage of the Company to borrow money for the purposes of its legitimate business, and negotiate its notes for the purpose of raising money for such purposes, and the moneys so borrowed were so used, and such notes when negotiated were uniformly indorsed in the same form as the note now in question was indorsed, that is evidence enough to warrant the jury in finding that the indorsement of this note was by sufficient authority to make it binding in favor of these plaintiffs, so as to give them title to this note, so far as such authority is in question.
And to this instruction the defendant’s counsel excepted.
*172 The Judge refused to submit to the jury the question whether the' Company was insolvent when the: note was transferred by the Company. ...
And to such refusal the defendant’s counsel excepted.
The jury found a verdict for the plaintiff for the.amount of the note in suit, with interest, $1,169.
And in pursuance of a direction to find specially upon the facts next mentioned; which direction was given by request of the respective counsel, the jury also found specially:
1. That the plaintiffs are bona fide holders of the note in suit, for value paid in due course of business-before the maturity thereof, and without any notice of the circumstances under which the note was transferred to MeCready, Mott & Company, or of any want of authority in the President of the. Company to indorse the note for the Company, or of other facts impairing its validity.
2. That the President of the Company had authority to indorse and transfer the note in the manner and form in which it was indorsed.
The Court thereupon ordered, that- the defendant’s exceptions. be heard in the first instance at the General Term, and that the judgment be in the meantime suspended.”
The only exceptions noticed in the appellant’s points, are those above stated; and exceptions to decisions .excluding evidence, that “the Company was reported to be solvent” when Marsh was President; and that the Company was insolvent when the note in suit was transferred to .MeCready, Mott & Company, which was in May, 1856.
Exceptions were taken to two propositions contained in the charge. The Judge charged, “ that the circumstances proved do not amount to notice to the plaintiffs of the circumstances under which MeCready, Mott & Co. received the note, however invalid the loan made. by them was, as it is in fact conceded to have been.”
To this instruction the defendant excepted.
James D. Fish testified that he, on the 12th of August, 1856, about 3 P. M., bought this note and others, amounting together to the principal sum of $5,002.50, of McCready, Mott & Company, for $3,500. “ McCready, Mott & Co. told me at the time that they had made a loan to the International Insurance Company, which *173 was past due, and they were authorized to sell the notes, which they held as collateral.”
McCready, Mott & Company, assuming the concession of plaintiffs’ counsel, (in stating the grounds on which he based their right to recover,) that their “ stock loan was not authorized or valid,” to be the truth of the case, acquired no title to the notes, nor any right to sell them. Fish, when he took this and the other notes, knew that McCready, Mott & Co.’s right to hold or sell them depended upon the terms and validity of a contract between them and the Insurance Company, in regard to a loan alleged to have been made to the Company on the security of such notes. If this knowledge was sufficient to put him upon inquiry of the Insurance Company, then the presumption must be, that, if he had inquired, he would have ascertained the fact to be, as upon the trial it was conceded to be, that the transfer of the note to McCready, Mott & Company was unauthorized and invalid.
On the 15th of August, 1856, the first of the three days of grace given by law to the maker within which to pay it, Mr. Fish, then a Birector of the Marine Bank, presented this note to the President and Cashier of the Bank, and asked them to pass it to the credit of his firm, which was done. “ Hothing else was said by either party in relation to the note. Williams (the President) asked me if Clements was good,” . . . About the time the note was protested, the Bank requested Fish to pay it, or signified a wish to that effect. Fish replied, “ Sue the maker of the note: if you cannot get it of him, look to us.” The Cashier of the Bank was examined, and was asked by defendant’s counsel, “Has it ever been your practice to discount single notes of similar amounts two or three days before they fell due?” His answer was, “Yes. We had for a longtime a written guaranty from Mr. Fish of the payment of all notes discounted by us for him. My impression is that the date of it is subsequent to our discount of this note.”
As the part of the charge now under consideration was given as a guide to the jury in determining “ the question whether the plaintiffs were bona fide holders of the note in question for value paid before maturity without notice,” we must consider the evidence above recited (in order to sustain the charge, if this were the whole of the charge on that point,) as not justifying the infe *174 rence that the plaintiffs’ President and Cashier had cause to sus- ' pect that Mr. Fish was anxious, for some reason, as to which they chose not to inquire, to make a formal transfer of the note to some one who would, in form at least, be a holder of the note for value before its maturity, (although only two days before,) and who, as such, on the note being protested, would sue the maker and attempt to collect it.
I cannot resist the conclusion that the facts tend to show, though not at all conclusively, that the plaintiffs’ officers, who passed this note to the credit of the firm of which Mr. Fish was a member, had reason to believe, and that it is not improbable they did believe at the time, that the whole object in procuring a formal discount of the note was to make the plaintiffs apparent indorsees for value, and thus discourage an attempt to defend a suit brought by them, when one would be attempted to a suit brought by Fish.
The evidence does not disclose that the firm of Mr. Fish had any present use for the money passed to their credit, or that they have not at all times since had on deposit a larger sum to their credit in the Bank than the nominal proceeds of the discount of the note. The accommodating conduct of the Bank in suing Clements, and forbearing to sue Mr. Fish, furnishes some evidence in favor of this view.
I think these circumstances should have been considered by the jury in determining whether the plaintiffs took the note without notice; which question involves the inquiry whether they took it without knowledge of any circumstances which should have put them upon inquiry into the circumstances under which it was obtained from the Insurance Company and by Fish. And if the case did not disclose that this question was not disposed of under this instruction alone, I should be strongly inclined to think that it must have been understood by the jury as importing that the evidence would not justify them in finding that the note was not taken by the plaintiffs in good faith, in the usual course of business, for value paid, and before maturity; and that, if not so meant, it was calculated to mislead.
But as it appears, that the question whether the plaintiffs were such holders, was specially submitted to the jury, and answered by them in the affirmative, it is perhaps a just construction of the part of the charge first excepted to; that all it was- meant or *175 ■understood to affirm is, that the circumstances proved, do not show, or justly tend to show, that the plaintiffs had notice of the transaction between McCready, Mott & Company, and the Insurance Company. That may be conceded to be true, as I think, it must be; and it may also be true that the jury were instructed to weigh all the circumstances proved, in determining the question whether the plaintiffs took the°note in actual good faith, and in the ordinary course of business, and without any knowledge or notice which should have led them as men of ordinary prudence to inquire into the circumstances under which the note was obtained from the Insurance Company and acquired by Fish.
The case states on its face, that it does not contain the whole charge; and we, therefore, conclude that we are bound to presume, that the instructions pertinent to a proper disposition of the special question first submitted were given, and were satisfactory to both parties.
The second exception to the charge, may be briefly disposed of.
There was uncontradicted evidence, that transfers ot notes belonging to the Company were made upon loans negotiated by “ the finance committee,” and that" in all cases the mode of indorsing their paper on transferring it, was the same as that of the indorsement upon the note in question, and that all this was ‘ known to the Company. There was evidence enough to justify the jury in finding that it was the usage of the Company, to make the notes belonging to it and payable to. its order, negotiable by the indorsement of its President as such.
And I think there can be no doubt, that after such a usage has been uniformly pursued for months, any one who becomes a holder of its paper so indorsed in good faith, in the due course of business, for full value, before its maturity, will acquire a good title to it, and can recover upon it. As against such a holder of its paper so indorsed, I think it quite clear that the mere fact that the Company was insolvent when the note was first negotiated to some prior holder, constitutes no defense.
This case is open to the further observation, that the defendant has no defense to the note, except the single one that the plaintiffs have no title to it. Neither the Company nor its receiver, so far as can be seen from the evidence, has questioned, or given *176 notice of an intention to question, the plaintiff’s title. The Company had of McCready, Mott & Company, $8,500, which was advanced on the security of this and the other collaterals, and has used the same in its business. Mr. Pish had realized at the time of the trial of this action (the 27th of Jan., 1859,) about $2,800, from all the collaterals, exclusive of the sum passed to the credit of his firm on the discount of the note in suit. McCready, Mott & Company obtained no more on the sale of the notes to Fish, than they loaned to the Company, and Fish has received less than he paid, (excluding the sum received on the discount of this note). We do not see that any injustice will result to any one from an affirmance of the judgment, or that any rule of law will be violated by it.
Judgment affirmed.[1]

 (See Scott et al. v. Johnson 5 Bosw., 213; Brookman v. Metcalf, id., 429; Ogden v. Andre 4 Bosw., 583.)